Johnson, Richard Anderson, and Andrew Wright. I'm Vivian Shevitz. I'm appointed to represent Aston Johnson on this appeal. Mr. Johnson's position is that he was not afforded effective assistance of counsel because counsel took no steps to protect Johnson when another defendant's lawyer became a second prosecutor. The government says, understandably, that Zafiro, the Zafiro case says that antagonistic defenses are not enough to warrant a severance in most cases. Mr. Johnson's counsel did not ask for one even though he knew in advance. I asked sort of in the middle, but not before the trial started. Right. Right. And then the problem is he did not take any steps to ask for an instruction, to limit the summation, to say anything while Wright's counsel was hammering Johnson about being the boss, being the two guys who were the murderers. There was a double prosecutor here. And we know that we don't need more than one prosecutor. One's enough. One's enough. And there are not many cases in which relief has been granted or which even a severance has been granted. But I point to the one cited in my brief by Judge Kogan in the Eastern District, the Nordlich case. And in that case, he granted a severance. Somebody asked beforehand. At the start of trial. Right. That's why I have to fall back on ineffective assistance of counsel. So I point to the Nordlich case to show that when there is a second prosecutor, which happened here, there should be a severance. But more than that, there has to be some step taken. Zaffiro and the prosecutor points out that instructions limit the harm when an inconsistent defense, antagonistic, more than antagonistic here, and he didn't object and he didn't ask for instructions. Is the record sufficiently complete for us to address this claim now? I think it is because he just didn't do anything. I mean, if anybody could ever think of a reason for that, a legitimate defense reason, I can't think of one. I mean, if you're a defense lawyer, you protect your client. And if there's a way of saying somebody else is becoming the prosecutor and Zaffiro says limiting instructions would help, I need some sort of limiting instruction. And it was not asked for. Nothing. Zero. Which asks you, what was he thinking about? And it wasn't protecting his client. And the question, of course, is would it have made a difference? And the government argues that the evidence against my guy, Johnson, was overwhelming. But, in fact, it was weaker than that of the co-defendants. Well, that's not the standard. It's not whether it's weaker relative to the co-defendants. It's whether it was sufficiently weak that but for these alleged errors, the outcome would have been different, right? I agree. Okay. I agree. So that's really good. So let me say why a jury with a limiting instruction properly focused on just what Johnson did and not what Wright said Johnson did might have acquitted or had some different verdict with regard to the various charges. And that is because the evidence shows that Wright, not Johnson, was the guy who got enraged when money was shorted. Wright and Anderson, I hate to point the finger at them because it's really not what I do, and that's what I'm arguing about. But let me say then, the co-defendants were enraged and set up the murder plan, apparently. Wright and Anderson got the guns from this guy, Bothman, and it was a 9 millimeter and a 45 millimeter. Wright and Anderson drove together. Wright and Anderson left the Holiday Inn together. And the guns were never recovered, but there was a match between a casing, not to my guy. There was nothing with my guy, really. The evidence was overwhelming, perhaps, that he was the connection for the Rochester people, but that isn't the whole case. And there's no evidence that Johnson had one of these weapons. So for those reasons, and because under a proper not aiding and abetting charge, but the charge that I'm going to, Mr. Gersak is going to talk about, we raised the Pinkerton aiding and abetting charge too, it would have made a difference if there weren't a broad aiding and abetting charge. Further, one point is my, Mr. Johnson's lawyer also did not join in the relevant motions. I'm not going to repeat those because my co-counsel is going to talk about the motions that were made for the courtroom and for the cell phone. I just want to say, as the cell phone standing, that imposing a lack of standing decision because somebody used a false name, to me, doesn't make sense. It's apples and oranges. You don't penalize somebody by saying you don't have an expectation of privacy, because you use a false name.  Sotomayor, it wasn't just a false name. It was a stolen identity, wasn't it? I don't know. It wasn't developed as to my guy. I believe it's the same as Mr. Obziehowski. I can't pronounce his name correctly. Sorry. His client, and he will tell you about that. But my client should have had an opportunity to develop that, and I think the standing issue is just wrong and should be considered in light of the cell phone cases by Justice Scalia and the other things, focusing on privacy and not whether the guy in the phone booth and Katz used a false name. Thank you, counsel. We'll hear from Mr. Arcevich. I probably mispronounced it, too. Thank you, Your Honor. Well, how do you pronounce it? Generally, Obziehowicz is how you'll hear an East European pronounce it. I go by Obziehowicz. Obziehowicz is correct? Obziehowicz is correct. Good. Now we know. Continue. Thank you. May it please the Court, my name is Jay Obziehowicz, and I am here on behalf of Richard Anderson. And we're going to ask that you vacate the judgment and remand for a new trial based on the constitutional structural error. We also will be asking that you remand, reopen the sentencing, excuse me, the suppression hearing. I want to begin, however, talking not about Mr. Anderson, but I would like to talk, start my discussion about Kevin Felton. Kevin Felton is a black male who, at the time of the trial, wore his hair in dreadlocks. And on October 3rd, he decided to come and observe the trial. However, members of the marshal service, employees of the marshal service, decided to remove him from the courtroom. Twice. Well, he ultimately was removed twice, yes. The first occurred in October, the second time occurred in December. The justification in both instances was that he was allegedly communicating with the defendants, and they were also concerned because he was doing, shock of all things, he was looking at the jury. I'm very surprised that anyone would look at the jury when you see a trial going on, but this seemed to upset the court security officers and the marshals. Well, never mind looking at the jury, but what about communicating with the defendants during the trial? That's not a cause for concern? Well, that's rather interesting, because what they told Judge Saragusa that he had done is he waved to the defendants. That was the communication that took place. And what's interesting is, while we don't know, we can't observe what happened in October, I did provide the court with a copy of a portion of the court security video. So a total of five minutes, but you'll see for all of three, less than three minutes that Mr. Felton was in the courtroom, you can see what he had done, is he did wave, that's all. Judge Saragusa addressed this the first time it came up in court, and he noted that this was a no consequence. It happens all the time in the courtroom. He doesn't want people communicating with the jury, but this was not a trouble, a reason to remove someone from the courtroom. And if you watch the video, please do so, it will show you that that's really all that he had done the second time that he appeared. It's the video actually this morning, and I couldn't see that he had done anything disruptive or otherwise removable. But you'll notice that he sat down and immediately CSO Lind came up to him, spoke to him. We don't know why. We don't know exactly what he said. He may have just been repeating instructions that Judge Saragusa told him to tell Mr. Felton that he should not communicate with anybody. But once CSO Lind sat down, Deputy Marshal Robinson immediately got out of his seat, came over, then joined by CSO Lind, and they removed him from the courtroom. He had had a previous interaction outside the courtroom, didn't he? You know, that's rather interesting, what happened outside the courtroom. That happened on October 7th. He had gone through the magnometers twice, because in the courthouse in Rochester, you have to go through a magnometer when you first enter the courthouse and show your ID. He then went up to the second floor where he had to go through a second magnometer. And as he approached the courtroom, he put his belongings on a bench. Sitting on the bench was the government's victim witness coordinator and one of their witnesses. And all Mr. Felton was doing was getting himself back together after going through all of court security. It was no stink eye? Well, you know, what is stink eye? What was really happening? I don't know. I want to know what it is. I wasn't at the courthouse at that time. I learned about the stink eye later on as we were reviewing the transcripts. What's also interesting is that the Mr. Rodriguez's co-counsel happened to report to the court that not only did he place stuff on the bench, he had a discussion with one of Mr. Anderson's attorneys, Robert Smith. What that discussion was, I don't know. Mr. Smith, when I most recently spoke to him about this case, doesn't even really recall it. But it was obviously of no consequence. And he had no problem talking to him. So everyone seemed to be upset with this individual who came in the courtroom. Yet what becomes even more egregious, on October 8th, you had the wife of a juror who was attending every day of the trial. She was outside in the hallway talking to one of the government's witnesses. We know that only because once Mr. Anderson's other counsel, Ann Berger, observed this, she was wondering what's going on and brought it to the attention of the court. And they were having a loud, boisterous conversation. Yet no one from the government, no one from the marshal's service seemed to be upset by this. Yet the black male with dreadlocks seemed to upset everyone every time he came into the courtroom. But even assuming that the marshals overreacted and acted improperly, that's not enough to get the case reversed, right? I would disagree with you. This is not trivial, what happened. First, we have Mr. Felton's right to be in attendance. He has a First Amendment right to be there. The problem is Mr. Felton is not represented by anyone in this case and is not pursuing these charges. But you should take that into consideration, his First Amendment rights to be present. How does it affect your client's right to a public trial? Because every criminal defendant is entitled to have family and friends attend their trials. Mr. Anderson is not from Rochester, New York. He's not from western New York. His family is on the west coast. They were not able to attend his trial. The one person that he knew in the community, other than people who were told to represent him, his assigned counsel, people from my office, and his co-defendants, the only person there on his behalf was Kevin Felton. And he was twice removed from the courthouse. And when he wasn't removed on the other times, they were putting pressure on him to make his appearance uncomfortable. They didn't want him there. When he came in, everyone was talking about it. They were reporting it to the judge. Mr. Rodriguez pointed out one day and told the judge, he is back, and letting him know. At that time, Mr. Sherman felt it important to point out other things that he observed, such as what happened in the hallway. And the following day, when Mr. Felton also came back, had to follow up further on that and say what other things that he had heard. And his belief that the jury observed him and was watching him, though no one from the jury said anything or reported any discomfort from him. So this is why it's not trivial. This was a purposeful attempt to get him out of the courthouse. It was repetitive. It was more than once, and they were making it so he would not show up. And it was done, actually, with the tacit approval of the court, though the court kept saying he is allowed to be there and he is allowed to attend. We find that the court, whenever he had the opportunity, was actually supportive of what the marshal service was doing. And, in fact, when you look at my other point about the cumulative effects of some of the other things that happened with the marshal service, particularly what happened when they started denying Mr. Anderson access to his clean clothing while the judge berated Mr. Anderson, he also pointed out that he thought that the marshal service did a darn good job. And he was giving them support for what they were doing. So this is why it becomes not trivial. And they were creating an environment so he would not be there. So we have a period of time when he does not show up in court, and we know that because one of the court security officers, when he was removed in December 4th, pointed out he had not been here for a while. Well, why would he have not been there for a while? Because he was being harassed each time he tried to attend the trial. So that's how Mr. Anderson was denied his right to public trial by this marshal. Do we know that's why he didn't come back? You're surmising that? We are surmising that, yes. There's nothing on the record to say that. No, it's not on the record. What's interesting is that Judge Saragusa kept saying, I should talk to him, I should talk to him. But Judge Saragusa never spoke to him. And we know that when we raised this in the Rule 29 motion. And Mr. Rodriguez happened to point out that to the judge that, no, he did not speak to him at all. He kept leaving it up to the marshals to do that. And when they did that, they still wound up interrogating him. When he came back to the courthouse in the afternoon after he was first removed, they not only gave him the instructions apparently that Judge Saragusa said to give that he shouldn't be communicating with anybody, but along with running his rap sheet — why do you run a rap sheet if someone who's attending a public trial? I don't know. But they — It's a triple homicide trial, right? I mean, it's not a tax fraud. Right. But he was not — Let me just finish. So, I mean, there's — in context, there's an understanding as to why it might be important to make sure that there's no attempt to intimidate the jury or to communicate with the defendants during trial. I mean, Judge Saragusa didn't bar him from the courtroom and didn't do anything to suggest he was unaware of these rights that you're talking about, right? But it doesn't — a partial courtroom closure is not done just by the judge. And this Court in the United States v. Smith has addressed this and recognized that the marshal service can actually cause a partial courtroom closure. And they did this in a case regarding when the rules to enter the courthouse were changed regarding the requirement that all people entering the courthouse must have a government-issued I.D. I understand all that. But one of the considerations in assessing whether this is trivial or not is whether or not the prosecutor and the judge are aware of the responsibility they have to ensure a public trial. And so Judge Saragusa was aware of that, right? Yes. But also the judge was supposed to make adequate Waller findings. And what — But what would you have had him do? Do you think he should have had, outside of the presence of the jury, made Mr. Felton come up and take the stand and answer questions? That would have been one way — But don't you think that would have been more chilling on Mr. Felton? Judge wants you up here under oath talking on the witness stand. It would seem to me that would be — you'd be criticizing that if he had done that. But no. What I'm concerned with is not the judge's actions. And I'm not criticizing the judge for those actions other than him not agreeing with the service. I thought you were. I thought you were criticizing him. What I'm concerned with is that the marshal service repeatedly was removing him from the courtroom and creating an environment to dissuade him from being there. When you say repeatedly, twice — how many times? Twice he was removed, yes. All right. So repeatedly doesn't usually mean twice. Twice. That's the right — It is twice, yes. Did the judge make Waller findings on the — The judge never made Waller findings. The one finding that he did, and this was during our Rule 29 motion, is came to the conclusion that the marshal service was acting in good faith. And that was his reason for rejecting our argument. That was addressing the whole range of conduct, right? I mean, you were — that was after — That was correct. And he believed that the marshals were acting in good faith in what they were doing and thought that was enough. But the good faith exception doesn't apply here. The question that applies here is whether or not the removal subverted the Sixth Amendment values of a public trial. And here the value is a person being entitled to have their friends attend the trial. Your time has long expired, counsel, but you have two minutes for rebuttal. Thank you, Your Honor. Let us hear from the third attorney, Mr. Gerzog, representing Andrew Wright. May it please the Court, my name is Lawrence Gerzog, and I do represent Andrew Wright. What I want to discuss with the Court today is Judge Sirigusa's aiding and abetting instruction to the jury, which we think was improper for a couple of reasons. One is that — oh, and another thing I want to discuss is Mr. Wright's murder convictions, which we think are not supported by the evidence. With respect to the aiding and abetting, Judge Sirigusa charged that the jury could consider 18 U.S.C. 2 in addition to the aiding and abetting statute or the aiding and abetting provision of the narcotics law. This Court in United States v. Walker has suggested that that is not appropriate and, therefore, should not — Judge Sirigusa should not have offered that instruction. The Court — this Court understands that the Walker case suggests that because there's a difference between section 2 and section 848E1A, that that — that section 2 adds to the different types of things that can constitute aiding and abetting. And here, by instructing on section 2, the judge allowed the jury to consider things that they should not, could not have, or ought not to have considered. Finally, with respect to the Pinkerton theory, the liability here — your argument — but we held in Walker that aider and abetter liability is available under 848E, didn't we? Oh, yes. I'm not suggesting that aider and abetter liability is not available under 848E. What I'm suggesting is if you're going — if the government is going to rely on 848E, they are not allowed to rely on 18 U.S.C. 2. That the Walker case made that finding or holding. And that here, Judge Sirigusa let that government, by its charge, by his charge, add the two elements of aiding and abetting that judge — rather, that 848E does not include. Furthermore, on the Pinkerton theory, there was not enough evidence to suggest that the three elements of Pinkerton, that any of them had been met, and that, therefore, charging on Pinkerton was also inappropriate. With respect to the murder counts, there was really essentially no evidence. The government claimed that there was circumstantial evidence that Mr. Wright participated in the murders, but there really wasn't. The — there was nothing to suggest that anything — Sotomayor, go to the place where the murders took place? Well, he — all the government knows is that he — that his cell phone pinged in a — in an area close to the place where the murders took place. But that, in and of itself, is immaterial. They never talked about — first of all, they never talked about exactly how close that was and so forth, and whether — and, of course, the fact that Mr. Wright owns his cell phone doesn't necessarily mean that he was using his cell phone and that not another co-defendant or someone else was using the cell phone. So the — Didn't the jury also hear ballistics evidence that the gun used to kill one of the defendants was received in Columbus? There is that, but then again, without the aiding and abetting circumstance, that is irrelevant. We don't know how Mr. — we don't know how Mr. Wright allegedly transferred the gun, and even if we did know that, because of the aiding and abetting situation, it would not be relevant to the government's case. I see that. I don't want to run too much into my rebuttal time unless it's — You have rebuttal time of two minutes. Correct. Thank you. Okay. We'll hear from the government. Mr. Rodriguez. Good morning. May it please the Court. My name is Everardo Rodriguez. I'm an assistant United States attorney in the Western District of New York. I was lead counsel during the investigation and the trial of this case before the district court. With your permission, I'll address the public trial argument first, and I think it's important, Your Honors, to clarify a few points. First, it's important to point out that the doors to this courtroom were never locked. The public was free to come in and leave at will. Secondly, it's important to point out that there were not repeated exclusions of Mr. Felton from the courtroom. And the record shows that. The record shows that on October 4th, the first time that the marshals noticed Mr. Felton, they didn't kick him out of the courtroom. They spoke to him outside the courtroom and told him you cannot communicate with the jury, and then specifically told him you're welcome to stay and watch, but you cannot communicate with the jury. He didn't come back until December 4th. And on December 4th, people noticed him. And, yes, we did notice him. We noticed him because, as Your Honor pointed out, this was a triple homicide case. The security of the witnesses, the security of the jurors was important. When this person was first approached by the marshals, he told them he was doing research on the jury. That's fair game for the marshals to be concerned. They didn't kick him out when they learned this. It simply drew their concern about him. As the record also shows that this man had been previously convicted of violent felonies. So there was reason for the marshals. It is their job to be concerned when people who have a history of violence enter the courtroom. Now, let's be clear as well. This is not Mr. Anderson's brother who was excluded. This was not Mr. Anderson's father or mother who was excluded. In fact, Your Honors, with respect to defense counsel, the proof on whether he was even Mr. Anderson's friend is not completely established. When he was first approached by the marshals on October 4th, he told them he didn't even know Mr. Anderson. Why was they asked why he was there? Not that he asked to give a reason. They asked what he was doing. And he said, one of the things he said is that he's doing research on the jury. Now, the prosecution didn't ask that he be removed. The court did not order that he be removed the second time. The marshals took it upon themselves to remove him. We concede that. But we submit that under the Constantino v. Kelly decision, Your Honor, from this court, that does not constitute even a partial closure of the courtroom. Asking somebody to leave one person. When I looked at the tape, I saw no other members of the public in the courtroom. He was the only member of the public that shows up on the video. So it was a closure, a partial closure, since you took out the only member of the public who was there. Well, Your Honor . . . Is that correct? Am I correct about that? I don't recall whether there was ever a time when he was the only person who was there, but I do know that those doors were never closed. The courtroom was always open to the public. When he was asked to step out, he was asked to step out because the marshals believed that he was engaging again in conduct that he was warned to not do, which is namely trying to communicate with the defendants. Now, we . . . Did you ever suggest to Judge Siriguza that he make Waller findings? Your Honor, I think Judge Siriguza attempted to determine what was going on. We have a procedure in place when someone is removed from the courtroom to make the findings according to Waller, whether there was the least restrictive means and et cetera. And did the government suggest to the judge that it might be useful if he made those findings? Judge, there was really no opportunity for us to do that on October . . . Well, Judge Siriguza didn't order him out of the courtroom, did he? Correct. Judge Siriguza did not order him out of the courtroom. He learned about it after the fact. He learned about it after the fact. There wasn't an opportunity for Waller findings. He could have made them after the fact, I suppose. He could have made them after the fact, but Mr. Felton never returned. He didn't return on October 4th after the marshals, despite the marshals telling him, you're free to stay, but you can't communicate with the defendants. And he didn't return after December 4th. Now, Judge Siriguza, on the record, said that the better approach would have been for the marshals to contact him and inform him of the situation, and then he would have attempted to apply Waller. He didn't have the opportunity to do that. I also looked at the video, as my colleague has referred to, and I have a difficult time seeing any disruptive behavior on the video. Could you explain what the context of the video? Well, Judge, are we talking about October 4th or December? There's no video of the first one. Right. We're talking about December 4th. Based on what the marshals said, Mr. Felton was attempting to continue to communicate with the defendants. Now, as I recall, it's been a while since I looked at this video. The camera is behind the spectators, the public. You don't see Mr. Felton's face. You don't see Mr. Felton's face. You don't see his hands. You don't see where he's looking or what he's doing with his hands. The marshals are in the courtroom. They are observing him. Now, Mr. Osijovic points out that the marshals paid attention to him. That's true. But let's be clear. They didn't pay attention to him because he was black or because he had hair, certain hair. They paid attention to him because he had indicated previously that he was there to do research on the jury, and he also had a criminal history with violence in it. The marshals were doing their job. Even if this court, and I'll finish on this point with respect to this issue, even if this court were to conclude that this was a partial closure of the courtroom, and we respectfully submit that it was not, I would respectfully cite the court to its decision in Peterson and ask the court in Peterson v. Williams and ask the court to apply the triviality standard. This, when Mr. Felton was excluded from the courtroom. The triviality as to the time out of the courtroom? The triviality as this was the only person who ever came to watch the trial. How could it be trivial? The only person who ever showed up to watch this trial. There's nothing in the record to indicate this was the only person who came to attend a trial involving a triple homicide? With respect, that is not right. Maybe during the times where the video was focusing on Mr. Felton, he's the only person who's seen in the courtroom. As I recall, that video doesn't show who's sitting or if anyone is sitting in the back rows. This case was a pretty significant case in the city of Rochester. People routinely came. Some interns came. The media came. The media was there constantly. They were reporting on that case constantly. It was a significant triple homicide case. The triviality standard would say that even if this was an improper closure, it should not warrant any type of retrial or dismissal of the action. This exclusion happened on the last day of the trial, after all the proof was closed, while the judge was reading the jury instructions to the jury. Now, no question. The jury instructions are important. That's for sure. But there had been a prior jury's charge conference where the lawyers hashed out the particular terms of the jury before this day. So all the issues with respect to the jury instructions had been decided prior to the jury instructions. The lawyers didn't know what had happened. The judge did not know what had happened. So there's no issue about somehow being important for maintaining an open court so that the lawyers can't, the prosecution can remain appreciative of the importance of doing justice. And there were no witnesses called. So the Peterson factor about keeping witnesses honest because they're testifying in public doesn't apply in this case either because no witnesses testified on that day. It was to speak in the time remaining. I don't mean to cut you off in the middle of a word. Can you speak to the rights of privacy that these defendants have in the use of their cell phones? Yes, Your Honor. What happened in this case with respect to Mr. Anderson's cell phone was not him simply using a fake name. Let's be clear about that. And if it was only that, then arguably the defense would have a claim. What happened in this case is that Mr. Felton, excuse me, Mr. Felton, Mr. Anderson, I apologize, Mr. Anderson used a stolen identity from a nursing home patient in Florida, Jason Key, a real person, by the way. We tracked him down and we found his ID. And used his Social Security number. Used his Social Security name. And he opened a Verizon or some cell phone account. Exactly. In this case, the information from the cell phone provider was obtained before Carpenter was decided. It was obtained before Carpenter was decided. But, by the way, search warrants were the state court judge that authorized, that ordered the phone company. We never got to this issue because Judge Feldman, the magistrate, ruled on the standing issue. But, in fact, there were warrants issued by the state court judge with respect to these phones. Mr. Anderson used fake identity not only to obtain that phone, but, in fact, to carry out his criminal activity in this country. He had been twice deported. So do you concede that he would have had a right of privacy if it was his own phone registered in his own name? Yes. No. Yes. I concede that the government would have had. But I think one of the other defendants had his own phone in his own name, and yet you got that information as well, didn't you? I think everybody in this case, all the defendants in this case, used fake names, Your Honor. Richard Anderson used Jason Key. Since each of the attorneys have some rebuttal time, I will ask them. I thought one of the attorneys said that his phone was registered to him. He may not have used it, but it was registered to him. And you got that data as well. As I recall, the names on the phones that were used were Jason Key for Richard Anderson, something Burke for. . . So they used aliases. No, but, Judge, not just aliases. They used these names to facilitate criminal activity. And you think use of an alias, and we haven't said this yet in a court case since Carpenter, but you stand, you are arguing that if you use not your own name in a phone that you pay for, you give up your privacy rights under U.S. v. Carpenter? Is that correct? Judge, Carpenter wasn't really a standing case. I think the case that maybe draws more concern, for us at least, was the Byrd case, which is the rental car case where the Supreme Court said that just because you're driving a rental car and you're not named on the contract, that is not enough to deprive you of standing. This is not that. There's actually no standing doctrine to speak of under Fourth Amendment law. You're just answering the question if you have a reasonable expectation of privacy. If you do, you have standing. If you don't, then you don't have a Fourth Amendment claim. So I guess the question my colleague is asking is would the mere use of an alias defeat your expectation of privacy in something you would otherwise have an expectation of privacy in? And I guess the answer to that has to be no. You know, if I checked into a hotel room using an alias, I would still have an expectation of privacy in the hotel room, which I had paid for, right? Well, Judge, there are cases, and we cite them in our brief, that says that use of an alias is, in fact, somehow deprives someone of an expectation of privacy with respect to the thing or the room for which they're using an alias. However, and this is key in this case, there was much more here than mere use of an alias. In this case, Richard Anderson and the other defendants used these fake names to pursue a criminal activity, namely to sell drugs cross-country, to travel cross-country. When Richard Anderson and Jason, when Richard Anderson flew from California to Columbus on an airplane, he used the ID Jason key. He did that to pursue not only the underlying drug conspiracy, but to facilitate the murder of these three men that ultimately happened. The cases are consistent that when somebody uses an alias to pursue or to facilitate criminal or fraudulent activity, then there is no reasonable expectation of privacy. That is not something that society is willing to accept. The courts are consistent, and in fact, the Byrd decision, the Supreme Court decision recently about the rental car and not having your name on the rental agreement, the Court specifically in that case said all we're saying here, the Supreme Court, all we're saying here is that not having your name on the rental agreement is in and of itself not enough to deprive your standing. It specifically excluded and reserved for remand the question whether somebody who uses an alias to pursue fraudulent or criminal schemes in fact does lose their standing. So the cases are pretty consistent on that point. When the cell phones were obtained? Judge, I apologize. I didn't hear the beginning of your question. What does the record reflect about when the cell phones, the cell phone relationship with the provider began? I don't remember the particular dates, Your Honor, but what's clear is, for example, for Richard Anderson, he was twice deported. When he came back to the country, he reconnected with Andrew Wright, and it was at that time, if I remember correctly, that he obtained the phone and the fake I.D. with Jason Key. He had to obtain the fake I.D. with Jason Key. May I complete my point? Yes, of course. He had to obtain the fake I.D. with Jason Key because under Richard Anderson, if he was found out, he would be deported a third time. Thank you, Your Honors. I appreciate the time. Thank you, counsel. I'll turn to each of the attorneys. In turn, we'll start with Ms. Chavitz. Yes. I don't know how my client rented or got his phone or not that was not developed. I will assume that he used a fake name to get the phone. I just wanted to point out that the issue of standing and privacy is not as clear, and there are many cases that say that. It is developing now. I just litigated a case recently in the First Circuit with regard to a fellow who used phony I.D. and was a guest in a hotel room. And at first, the First Circuit ruled . . . The Federal Court in Maine had ruled in defendant's favor. At first, the First Circuit ruled against us and said, standing, standing, standing. And on a motion to reconsider, the Court reconsidered and vacated that opinion on a standing basis. So I don't think the expectation of privacy depends on what name you use. It's apples and oranges. If you commit a crime, you can be prosecuted. If you use a cell phone and a phony name, you still have an expectation of privacy. If you stand in a phone booth and make a call and you say your name is Joe Smough, then you still have an expectation of privacy. And I think it's apples and oranges and the — I think it's the Riley case, perhaps, where Justice Scalia started talking about returning to the expectation of privacy and trespasses. And if you trespass on my phone, even if I have a phony name, I think you still — I still have an expectation of privacy. I'll leave it at that. I can give you the name of the First Circuit case, if that would be helpful. Sotomayor. Send it. Send it to the clerk's office. Okay. We'll all get copies. Thank you. Thank you. Mr. Osiyovitch? I know I did it wrong again. Osiyovitch. I do, Your Honor. Osiyovitch, right? That will work. Osiyovitch will work. Mr. O will work. I'm very liberal in its use. I take no offense to any pronunciation. There's a few points that I would like to respond to, if I may. One correction from Mr. Rodriguez. The record does show that Mr. Anderson — excuse me, Mr. Felton did return to the courtroom on October 7th. It also shows that he returned on October 8th. And, in fact, those are when questions came up about him. He was not removed, either. His activities were pointed out. It was addressed that he spoke to Mr. Smith. It was addressed that he put his coat down on a pew outside the courtroom as he was putting himself back together after going through court security. And you don't think marshals or judges should be able to ask questions about those kinds of things or observe those sorts of things? It's not a question of that. That doesn't go to an open courtroom, right? It goes to the kind of environment that they were addressing with him, that the question of him being there, yes, it does. But you're saying that there's not just a right to an open courtroom now. There's a right to sort of a friendly environment in the courtroom? Well, courts need to be — Is there any evidence that he was chilled from coming back to the courtroom? No. We do not have evidence quite to that extent. We do know, though, that he was removed twice. The first time he was removed, I disagree with Mr. — with my learned colleague. That was a partial closure. Even though he was ultimately allowed back, he was removed from the proceedings at that point. For how long? Until he came back in the afternoon. Well, what's the record reflect with respect to how long he was out? We don't have a timeframe for that, Your Honor. And we do know that the second time that he was removed, he was told, don't come back. And this was not done by the court. This was done by the marshal service, telling him. The second time is on the day — I mean, the point being made by the prosecutor is that it was the day of jury instructions, right? It was the day of jury instructions. Correct, Your Honor. Now, I also want to point out the question regarding his doing research. In fact, this is one of the reasons why we have an open courtroom. The first time he was asked, you know, and keep in mind this is a person, one of the only black men other than the defendants in the courtroom, who comes in, wants to observe things. All of a sudden, he's being questioned about his activities, which were really, as the judge described, inconsequential. But all of a sudden, he's being questioned on it. What he tells them, he's doing research on the jury. When he comes back to the court and the marshals talk to him, they tell the judge he changed his story, yet his story didn't change. What he did was, according to the court security officer, he told them he was doing research on some case v. Kentucky, which is researching the jury. He was interested in knowing, and this was also relayed by the court security officer, the racial makeup of the jury. He was trying to see, is this a fair trial, and are these criminal defendants and his friend getting a fair shake and having a representative jury? Now, you or I may know that a jury doesn't have to be, have African-American members of the community on to be a fair jury, but this is what he was interested in finding out. This is research on a jury. This is what Waller is about. So I think this is important to consider. This was not trivial. If you look at the cases where the courts have found the triviality exception applies, it's usually, it's often in inadvertent closure. It's often for a very short duration of time, but here we had the member of the public being told ultimately not to come back, and there has to be appropriate Waller findings, which Judge Saragusa never made. There is one other thing, if I may, briefly, just because it came up regarding the cell phones. I don't recall wearing the record, but they did have at least one individual who sold cell phones talk about it. I would like to remind the Court of the decision from another panel of this Court, United States v. Fields from 1997, where it was pointed out that privacy expectations do not hinge on the nature of the defendant's activities. And my learned colleague here wants you to focus on the nature of his activities. So it's not the criminal activity, but what about the alias and the stolen identity? Well, except while he was using an alias, aliases are used all the time. There are plenty of court cases that have recognized that use of an alias does not eliminate the privacy interest. But surely stealing someone else's identity and using their Social Security number and their name as your own, how can you have an expectation of privacy and the use of that name to accomplish it? People knew Mr. Anderson as Jason Key.  He paid for the phone as Jason Key. But if the real Jason Key was contacted by the government or the phone company and asked, are you okay with us getting cell site information on the phone that's registered in your name with your Social Security number? He might have said yes. And so presumably your client would have no expectation of privacy because he would know that the real Jason Key might give consent. Then we would be in a different posture at this point and have to deal with a different question. Why would we be in a different posture? The issue is expectation of privacy. Does a person who steals another's identity have an expectation of privacy when he knows that the real person might actually cooperate with law enforcement? Well, we don't know. We don't know what Mr. Anderson knew about where this identity came from or how he obtained it. He has to have known that. He has to know whether the actual person who was the true – Again, we don't know all the circumstances of that. For all he knew, these numbers could have been made up. It could have been someone who was long deceased. These are things we don't know at this point. The government says there was a warrant in this case. Can you – is that a warrant based on probable cause or just a court order to obtain the cell? I don't recall the full nature of the warrant at this time, Your Honor. I would have to look at it. Wouldn't that be pretty important to your claim, though? Well, because we did not get to it at this point. There were still questions early on at this – in the litigation as to what was valid. I believe it was a warrant from the government to get this information under the – I can't remember the act off the top of my head. Board communication act? Thank you. Yes. I believe it may have been that. That would have been not based on probable cause then. Can I ask this question? So if Mr. Rodriguez stole your phone from here and it was open, he stole it, he walked out of here, and he started making phone calls over the next half hour, your view is that the government would have to get – the FBI would have to get his consent or a warrant before they could get cell site information to use against him when he had your phone and was making calls? If Mr. Rodriguez stole my phone, he probably would not have much success with it, but there becomes questions as to what he was doing with the phone. He's not taking over the account. He's not paying for the phone. While the phone is stolen, it's still not his phone. He would not necessarily have an expectation of privacy there, Your Honor. Okay. Thank you. Thank you. Mr. Gershog, you have two minutes for rebuttal. My adversary did not directly address any of my arguments. I thought I would, with the Court's permission, talk a little bit more about the cell phones. Of course. There's nothing in the record to indicate that my client's cell phone was based on stolen identity. It may well have been based on an alias, a name different from his actual name, but there's nothing in the record to indicate that it was based on stolen identity. Did you move to suppress the cell site information? Hello? What you mean is did trial client? Yes, that's what I mean. Did your client? I actually, quite frankly, don't remember. I can send a letter to the Court to answer that question. I don't remember right now whether there was that motion was made. But I think Judge Livingston put her finger on it when she said, it isn't really a matter of standing, per se. It's a matter of expectation of privacy. And also, right in the government's brief, they quote in a circuit case called the United States v. Lewis, and they say a mailbox bearing a false name with a false address and used only to receive fraudulently obtained mailings does not merit an expectation of privacy. There's no indication that these phones were used only for criminal activity. In fact, I think there is significant evidence in the record that they were used for other purposes and that they were, in essence, Your Honor said, if he stole the cell phone, that's one thing. But they were the cell phones of these folks, the defendants. Counsel, do you think that if the cell phone data was suppressed or not allowed into the trial, there's a likelihood that you and the other defendant, that your defendant and the other defendants would not have been convicted? Certainly of the murders, my client would not have been convicted. The only even remotely significant evidence, and one of you, one of these judges, this panel suggested that there was evidence that my client was near the murder site. That was based on a ping off the cell phone he was holding. There's nothing else. So he wouldn't be put at the scene without the cell phone? Anywhere near the scene, and that was, and although I don't concede that that one ping puts him at the scene, because as I said, we don't even know who was using the cell phone. But there were reports that two men ran from the house, and you're arguing that your guy is the third guy who was not there. Is that correct? That's absolutely correct.  I'm assuming there was a Fourth Amendment violation in the use of the cell site location information. Why wouldn't this be subject to the good faith doctrine? Well, I don't understand. I'm not sure I understand your question, Judge. Well, this evidence obtained, if I'm understanding the record correctly, was obtained prior to the decision in Carpenter. Right. And prior to that, I don't believe there was any circuit law, any authority in this circuit that said that you had an expectation of privacy in records held by your cell phone provider. It was third party information. Well, isn't the fact that this court decided Carpenter, does that not, are you saying that because when it was originally. I'm asking you. I would suggest that that's not the case, that this Court's decision in Carpenter, given the temporal, you know, situation. It was on direct appeal. Exactly. Thank you. Again, you're not sure if this argument was ever made below. As I said, I am not sure. It's a 10-volume or 20-volume record, and I just can't recall. It's not argued really in your brief, right? You just sort of joined. That's correct. With the header. We did join. The 28J of your code. We did. It's true that we don't have a separate section on it, but as far as I'm aware, the fact that we joined in it, even in a header, as Your Honor said, gives us the right to argue that to the Court. But I understand what Your Honor is thinking in terms of having waived it perhaps below, and that's what I have to address in the letter. Thank you. Thank you all for very lively arguments. We appreciate the work of the appointed counsel. Thank you.